WILLARD R. WILLIAMS AND DONNA WILLIAMS, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Williams v. Commissioner
Docket No. 7841-82.
United States Tax Court
T.C. Memo 1985-201; 1985 Tax Ct. Memo LEXIS 430; 49 T.C.M. (CCH) 1324; T.C.M. (RIA) 85201; April 25, 1985. Kenneth R. Mourton, for the petitioner. David A. Hampel, for the respondent. KORNER
MEMORANDUM FINDINGS OF FACT AND OPINION KORNER, Judge: Respondent determined a deficiency in Federal income tax against petitioners for the taxable year ended December 31, 1978, in the amount *432 of $107,755. The issues presented for decision are: (1) Whether petitioners' purported transfer of real estate to a trust as settlement of a note guarantee obligation constitutes a sale or other disposition of property requiring the recognition of long-term capital gain; (2) whether petitioners are entitled to deduct an ordinary loss, in the amount of $175,000, from an alleged partnership; (3) whether petitioners are entitled to a bad debt deduction in the amount of $175,000; (4) whether petitioners are entitled to an interest expense deduction in the amount of $20,497; (5) whether petitioners are entitled to claim a theft loss or an investment loss in the amount of $50,000 in connection with an investment in Costa Rica; (6) whether petitioners suffered a theft loss or an investment loss, in the amount of $44,040 in 1978, in connection with the purported purchase of foreign currency and gold bullion. [1]
*433 FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts, supplemental stipulation of facts, and exhibits attached thereto are incorporated herein by this reference. Willard R. Williams (hereinafter referred to, interchangeably, as "Willard" or "petitioner") and Donna Williams (hereinafter "Donna") were husband and wife and residents of Decatur, Arkansas, at the time of filing their petition in this Court. Willard and Donna (hereinafter referred to, collectively, as "petitioners") filed a joint Federal income tax return for the taxable year ended December 31, 1978. I Petitioner entered into an exclusive listing contract with Bray and Company, a real estate brokerage firm, on February 18, 1978. Petitioner granted the exclusive right to sell a property located one mile west of Naturita, Colorado, (hereinafter the "Colorado property") to the above-mentioned real estate brokerage firm. Such listing was effective until November 1, 1978. The property was offered for sale at a price of $330,000. The Colorado property was not sold within the period during which the listing was effective. A three-bedroom house was located in the property; *434 the house was rented during 1978. Prior to March 1978, petitioner had been employed as president and general manager of Williams, Inc., a Colorado corporation engaged in the business of mining, heavy construction, ready-mix sand and gravel, land development, and other small retail operations. Petitioner departed as chief executive officer of Williams, Inc. in March 1978, due to his poor health. Prior to petitioner's departure, Williams, Inc. adopted a plan of complete liquidation. Petitioners reported a long-term capital gain of $497,932 from the liquidation of Williams, Inc. on their income tax return for the taxable year 1978. Petitioners moved to Marco Island, Florida, in March 1978, following the advice of physicians that petitioner relocate in a new climate to remove himself from the pressures attendant to his association with the business in Colorado. Shortly after moving to Florida, petitioner developed an alcohol problem. Petitioner commissioned his long-time friend Fred McKinney (hereinafter "McKinney") to collect the rental payments and to look after the Colorado property in March 1978. McKinney mailed the rental payments to petitioner, after deducting the expenses *435 of keeping the property in a state of good repair. In April 1978, petitioner was telephoned by Jack McCann (hereinafter "McCann"), who told petitioner that he had located and identified a sunken Spanish treasure ship off the Cayman Islands and that he had the expertise to recover the valuables, but needed a financial partner in order to proceed with the recovery. Petitioner agreed to meet McCann at the Jolly Roger, a pub in Marco Island, to discuss the details of the recovery operation. McCann identified himself by showing to petitioner a seadiver card. McCann produced underwater pictures of the alleged Spanish treasure ship, maps, coins (which had allegedly been recovered from the ship), and documents. Petitioner and McCann reached a preliminary agreement to form a partnership to excavate and salvage the valuables from the shipwreck. McCann represented to Willard that the capital for the venture was to be obtained from Cayman Exchange, an alleged Cayman Islands organization with which McCann had made prior arrangements. On April 23, 1978, [2] petitioner and Jack McCann signed a document entitled "Partnership agreement," prepared by McCann's attorney. The agreement purported *436 to create a partnership by the name of Williams & McCann for, inter alia, the purpose of engaging in the business of reclamation and salvage of gold and silver and other items of value from the shipwreck. The amount of $350,000 was to be contributed to the partnership as initial capital. Pursuant to the partnership agreement, McCann was to execute a note to Cayman Exchange, with petitioner as cosignatory, for the aforesaid $350,000. McCann was to report to petitioner on the progress and success of all operations and perform the day-to-day operations; he was to devote 50 hours per week to the partnership's business in exchange for a weekly salary of $500. Petitioner was to devote no time to the partnership and to receive no salary other than his share of the profits. Profits and losses were to be shared equally. The taxable year of the partnership was a fiscal year beginning April 1 and ending March 31. Petitioner and McCann signed a document entitled "Demand Note," on April 23, 1978; the said note provided that McCann promised to pay to the order of Cayman Exchange the sum of $350,000 together *437 with annual interest thereon at the rate of 9 percent, from April 23, 1978 until maturity. The note was, by its terms, due on October 23, 1978, together with interest in the amount of $15,750, for a total payment of $365,750. Petitioner signed as guarantor. The document provided, further, that in the event of a default, where real and/or personal property was committed to satisfy said default, the party holding title to such property was to enter into a trust agreement with Cayman Exchange, and to hold title to said property as trustee. The property would then be disposed of by the trustee acting as Cayman Exchange's agent in a manner prescribed by Cayman Exchange; the proceeds would be then remitted directly to Cayman Exchange or its assigns. No real nor personal property was committed in advance to satisfy any possible default. Petitioner did not meet any representatives or agents of Cayman Exchange prior to his signing the note on April 23, 1978; nor did he see any checks, money orders, cash, or any other document transferring money from Cayman Exchange to McCann or the Williams & McCann partnership. Petitioner believed that the Exchange had loaned the $350,000 to McCann. *438 McCann telephoned Willard regularly to inform him of the recovery operations allegedly being conducted. McCann represented to petitioner that he had leased a barge for the salvage project. Petitioner never visited McCann's office, nor did he ever see the barge, diving equipment, nor any recovered treasure. Around November 6, 1978, petitioner received a call from Thomas Grecco (hereinafter "Grecco"), who identified himself as president of Cayman Exchange, requesting payment of the note. According to Grecco, the note was past due, McCann had not paid, and his attempts to locate McCann had been unsuccessful. Petitioner attempted to locate McCann after Grecco made requests for payment of the note, but his efforts were unsuccessful. In December 1978, petitioner met with Grecco in Fort Myers, Florida, to discuss the payment of the note. [3] Petitioner informed Grecco that he was not in a position to pay the note but that he had some land in Colorado - the Colorado property - that he could exchange for the note. Grecco told petitioner that he was favorably impressed by petitioner's offer, acceptance being conditioned upon Grecco's check on the value of the property. Petitioner was *439 not aware whether Grecco visited the Colorado property, or in any way checked on the value of the Colorado property. On December 17, 1978, petitioners executed a document entitled "Warranty Deed," purporting to transfer title of the Colorado property to the Colorado Land Trust; Willard was the trustee. The warranty deed was recorded by the county clerk and recorder of Montrose County, Colorado. The aforesaid deed was the last deed recorded with the county clerk and recorder of Montrose County, Colorado, in regard to the Colorado property, at the time of trial herein. On December 17, 1978, petitioner and Grecco also executed a document entitled "Declaration of Trust" (hereinafter the "trust agreement"). The trust agreement provided that petitioner, as trustee, had taken title to the Colorado property, and that he would hold, dispose, and convey the same in trust for the use and benefit of Cayman Exchange. Paragraph 3 of the trust agreement reads as follows: The terms of this trust shall be during the lives of the beneficiaries hereunder, or until the above-described property is disposed of, whichever is sooner. Paragraph *440 5 of the trust agreement provided: That the Trustee shall have full power to improve, manage, protect, or sell the trust property or any portion thereof, on such terms and upon such conditions as he shall deem proper in his best judgment and discretion and, in general, the said Trustee shall have every power over the Trust as he would have if he were the absolute owner thereof. In the event of the sale of the trust property or the receipt of income from said property, the Trustee shall distribute the proceeds of said sale or income to the beneficiary hereunder after deducting all of the accrued expenses of the Trust. The trust agreement provided, further, that upon the death or incapacity of petitioner, Cayman Exchange was to become the successor trustee of the Colorado Land Trust. Immediately after signing the trust agreement, Grecco delivered the note, stamped "PAID December 17, 1978" and signed by him, to petitioner. Petitioner notified McKinney about the transfer of the Colorado property to the Colorado Land Trust and requested him to continue collecting the rental payments and keeping the property in a state of repair; according to petitioner, McKinney agreed to do *441 so. The property tax bills for years 1979 and 1980 pertaining to the Colorado property were mailed to petitioner, as trustee of the Colorado Land Trust, at petitioner's Marco Island address; the property tax bills for years 1981, 1982 and 1983 were mailed to petitioner, as trustee of the Colorado Land Trust, at petitioner's Decatur, Arkansas address. Petitioner forwarded the aforesaid property tax bills to McKinney, who paid them out of the rental payments. Petitioner, as trustee of the Colorado Land Trust, never sold, nor in any way disposed of, the Colorado property. Petitioner unsuccessfully attempted to locate Grecco in January 1984; petitioner traveled to Marco Island and Grand Cayman Island for this purpose. Petitioners reported the above-mentioned transactions on their 1978 joint income tax returns as follows: a. Petitioners reported a long-term capital gain, in the amount of $217,997, on the transfer of the Colorado property to the Colorado Land Trust. [4]
b. Petitioners claimed an ordinary loss in the amount of $175,000 from the Williams & McCann partnership on Schedule E. c. Petitioners claimed a nonbusiness bad debt deduction in the amount of $175,000 on *442 Schedule D. d. Petitioners claimed an interest deduction in the amount of $20,497 on Schedule A. In his statutory notice of deficiency, respondent disallowed the losses and excluded the gain from income. II Petitioner was telephoned by J. Ares A. Monty (hereinafter "Monty") in July 1978 regarding an investment opportunity involving beach front property in Costa Rica. Petitioner went to Costa Rica to inspect the property in July 1978, and Monty met petitioner at the airport in Costa Rica. Petitioner rented an airplane to inspect the property from the air. An agreement was entered into by petitioner and Monty on July 22, 1978, regarding a piece of property located in Puerto Jimenez, in the province of Puntarenas, comprising 31 hectares and 8,405.57 square meters, [5] (hereinafter the "Costa Rican property").The total sales price was $50,000 -- $5,000 payable on the signing of the agreement and the remaining $45,000 payable upon the grant of beach lease *443 rights by the Municipality of Golfito to Piro Inversiones, S.A. (hereinafter "Piro Inversiones") and the delivery of the stock of Piro Inversiones to petitioner. Petitioner paid $1,000 in cash to Monty; petitioner also gave two checks, dated July 22, 1978, in the amount of $2,500 each, to Monty. Petitioners received correspondence from Monty regarding the Costa Rican property on July 31, 1978, August 21, 1978, August 29, 1978, and October 30, 1978. Attached to the letter dated August 29, 1978, was a document purporting to be the minutes of a meeting of the stockholders of Piro Inversiones, dated August 16, 1978, written in Spanish. [6]
A check for $25,000, signed by Donna and dated November 6, 1978, was presented to Christian Ares (hereinafter "Christian"), who had been identified to petitioner by Monty as his son, at petitioners' home in Marco Island. A fourth check dated December 22, 1978, in the amount of $19,000, signed by Donna, was given to Christian at petitioners' home in Marco Island. The cash *444 and four checks delivered to Monty and Christian total $50,000. Piro Inversiones, represented by Gerardo Urena Carvajal, filed a writ of possessory information before the Instituto de Tierras y Colonizacion (hereinafter "ITCO"), [7] a government agency of Costa Rica. Piro Inversiones stated that it had possessed the Costa Rican property in a quiet, public and peaceful manner for more than ten years in its capacity as owner, and requested that a recordable title be given to it pursuant to the provisions of Costa Rican Law No. 4545 of March 20, 1970. The aforesaid possessory information was approved by the Board of Directors of ITCO, and an order issued that title to the Costa Rican property be recorded in the Registry of Property in the name of Piro Inversiones, subject to the provisions of Article 17 of the Law of Possessory Information, No. 4545 of March 20, 1970, and other provisions herein not material, on February 9, 1977. Article 17 of the aforementioned Law of Possessory Information provides, generally, that any real property, title to which has been recorded in the Registry of Property pursuant to the provisions of the aforesaid law may not be, without the express authorization *445 of ITCO to this effect, sold, leased, mortgaged, nor in any way encumbered -- with exceptions not herein pertinent -- within three years from the date on which such title is recorded. The resolution of the Board of Directors of ITCO was transcribed and made part of the protocol of the notary public Virgilio Fernando Calvo Murillo, as deed number 87, dated March 14, 1977, of said protocol. A certified copy of the above-mentioned deed was issued on the same date. Copies of both the resolution of ITCO, approving the possessory information and ordering that title to the Costa Rican property be recorded in the Registry of Property in the name of Piro Inversiones, and of deed number 87 of Virgilio Fernando Calvo Murillo's protocol were delivered to petitioners on December 22, 1978, by Christian. Also delivered to petitioners was a document entitled "Solicitud de Concesion," [8] dated August 23, 1978, requesting the Lease Division [9] of the General Registry of Concessions that a permit to lease the Costa Rican property be granted to Piro Inversiones pursuant to Costa Rican Maritime--Terrestrial Zone Law No. 6043 of March 2, 1977, and Executive *446 Decree No. 7841-P of March 16, 1977. [10] The aforesaid application was granted by the General Registry of Concessions. *447 In addition to the aforementioned documents, petitioners received from Monty what purport to be two certificates of stock in Piro Inversiones, each with a stated value of 5,000 colones. [11] One of the certificates of stock, representing five -- of the ten authorized -- shares of common stock was issued to petitioner; the second certificate of stock was issued to Robert L. Leighton (hereinafter "Leighton"), an old acquaintance of petitioners. Both certificates are signed by petitioner, as president of Piro Inversiones. Petitioners did not in any way transfer the Costa Rican property, nor did they dispose of the certificates of stock in Piro Inversiones during the year 1978. Petitioner returned to Costa Rica in January 1979 in an effort to locate Monty; he was unsuccessful. Petitioners claimed no entitlement to a loss deduction from the aforesaid transaction in their timely filed Federal income tax return for the taxable year ended December 31, 1978, but such claim was made in the amended petition to this Court filed on November 14, 1983. Petitioners contend that they sustained a loss in 1978, in the amount of $50,000, *448 arising from the investment in the Costa Rican property, and, further, that the aforementioned loss was deductible either as a theft loss under section 165, [12] or as a bad debt loss pursuant to section 166. Respondent disputes the claim. III In the latter part of 1978, petitioner was telephoned by a man named Steve Hafner (hereinafter "Hafner") who proposed that petitioner invest in forward contracts in gold, viz, deferred delivery contracts, with Metals Depository Corporation (hereinafter "Metals Depository") in New York City, New York, and Alpha Currency, Inc. (hereinafter "Alpha Currency") its counterpart in New Jersey. On November 20, 1978, petitioner wired $20,050 from his account at the First National Bank and Trust Company of Naples, Florida, to Metals Depository; $9,600 -- of the $20,050 -- represented payment of the selling costs on a deferred delivery contract in gold, and $10,450 represented payment for 50 krugerrands at $209 each. On November 20, 1978, petitioner *449 received a mailgram from Metals Depository informing him that 200 troy ounces of gold, at a price of $199.20 per ounce, to be delivered in May 1979, and 50 krugerrands, at $209 each, had been purchased for his account. The total price of the gold contract was $49,440. [13] On November 21, 1978, petitioner received a mailgram from Metals Depository acknowledging receipt of the $20,050. Petitioner received an official confirmation of the aforesaid transaction, dated November 24, 1978, from Metals Depository. On December 21 or 22, 1978, petitioner wired $23,990 to Alpha Currency; $12,000 of the $23,990 represented partial payment on a contract for the purchase of 200,000 Deutsche marks at a total price of $120,720, to be delivered in March 1979. The remaining $11,990 represented partial payment in a contract for the purchase of 200,000 Swiss francs at a total price of $133,950, to be delivered in March 1979. On December 24, 1978, petitioner received a financial statement from Metals Depository. According to the aforesaid financial *450 statement, Metals Depository had total assets in the amount of $609,018. Hafner had represented to petitioner that Metals Depository had millions of dollars in assets. Petitioner received a telegram, signed by Larry Burman, as executive vice president of Metals Depository, dated January 2, 1979, confirming that the above-mentioned contracts had been purchased for his account. An official confirmation of the transaction, dated January 9, 1979, was mailed to petitioner's Marco Island address. Petitioner received a note from Metals Depository, signed by S.H. (presumably Steve Hafner); the note reads: "Wid - This is a copy of our performance bond for your records." Attached to the note was a document which purported to be a performance bond, dated January 24, 1979. Petitioner spoke to employees or representatives of Metal Depository at various times during 1979. In order to keep a record of the telephone calls that were received from the people of Metals Depository and Alpha Currency, petitioner instructed Donna to make notations on a calendar for the month of February. The aforesaid notations reflect that: (1) On February 5, 1979, Steve [14] called petitioner; (2) on February *451 6, and 7, 1979, Bob Burns called. [15] The notations for February 9, and 10 read: "Burns called & set NY meeting for Sat." and "Met with Bob Burns & Steve Schafer [16] Airport," respectively. The notations for February 11, and 13, 1979 read: "Called here for your decision whether you would invest" and "Burns [d]idn't have authority to settle didn't get back til Tues -," respectively. In February 1979, the Federal Bureau of Investigation (hereinafter "FBI") seized the records of Metals Depository, pursuant to a search warrant, and arrested the principals of the company. The same individuals were involved with Alpha Currency, although Alpha Currency dealt in foreign currency rather than with gold bullion. In the course of the investigation culminating with the issuance of the search warrant, the FBI apparently learned that Metals Depository had been organized by individuals with prior criminal records. On February 26, 1979, petitioner met with Frank J. Donaty, Jr., of the Securities and Exchange Commission (hereinafter "SEC") in Washington, D.C. regarding *452 his gold and foreign currency transactions with Metals Depositaries and Alpha Currency. Petitioner received a letter, dated February 28, 1979, from Donaty indicating that copy of the materials pertaining to petitioner's transactions had been forwarded to the Commodity Futures Trading Commission (hereinafter "CFTC") in Washington, D.C.
On March 13, 1979, John A. Field III, Director of the Enforcement Division of the CFTC, sent a letter to petitioner, advising him that the information sent to them by the SEC had been forwarded to their Regional Counsel in New York. Petitioner was apprised of his right to file a reparations claim against Metals Depository. Willard was supplied with a reparations claim form by the CFTC; petitioner filled out the claim form, but never filed it. Petitioners claimed a short-term capital loss in the amount of $44,040, representing their total investment in gold and foreign currency, on Schedule D of their joint income tax return for the taxable year ended December 31, 1978. Respondent disallowed the aforesaid deduction. OPINION Issue 1. Transfer of Colorado Property in Settlement of Indebtedness;
Issue 2. Partnership Loss;
Issue *453 3. Bad Debt Deduction; and
Issue 4. Interest Expense Deduction.
[17]
We must determine whether the transfer of the Colorado property to the Colorado Land Trust in payment and cancellation of the note payable to Cyman Exchange constitutes a taxable exchange, requiring petitioners to recognize long-term capital gain. We must also determine whether petitioners are entitled to claim deductions for a partnership loss, bad debt loss and interest expense. Petitioners contend that an agreement was reached between petitioner and Grecco, pursuant to which petitioner was to transfer the Colorado property, in trust for the benefit of Cayman Exchange, in consideration for the cancellation of the note signed by petitioner as guarantor, and that the aforesaid transfer constituted a disposition equivalent to a sale upon which gain is recognized in the amount of the difference between the amount of the indebtedness which was canceled in consideration for the transfer and the basis of the property, citing Danenberg v. Commissioner,73 T.C. 370 (1979), *454 and Bialock v. Commissioner,35 T.C. 649 (1961). Thus, petitioners' argument follows, they realized long-term capital gain on the transfer of the Colorado property in settlement of the note payable to Cayman Exchange. According to petitioners, the economic significance of the transaction is evidenced by an identificable event, namely, the execution and delivery of the warranty deed. As a result of the transaction, petitioners further claim: (1) A deduction in the amount of $175,000, representing Willard's distributive share of an alleged loss from the Williams & McCann partnership; (2) a bad debt loss in the amount of $175,000; and (3) an interest expense deduction in the amount of $20,497. Petitioners argue that due to the actions of McCann, [18] the partnership investment of $350,000 was lost, that this was a loss of the partnership, that losses from the partnership were to be allocated 50 percent to McCann and 50 to Willard, thus petitioner is entitled to deduct 50 percent of the partnership loss, or $175,000. Petitioners argue, in support of their contention, that the proceeds from the execution of the note were intended to constitute the working capital of *455 the partnership and the note was signed by both partners as obligors. Petitioners also contend that Willard's satisfaction of McCann's indebtedness, which allegedly became worthless in the hands of Cayman Exchange, gives rise to a nonbusiness bad debt deduction, because the debt is also worthless in the hands of the guarantor. Petitioners argue, alternatively, that the $175,000 is deductible as a business related bad debt.[19]
Petitioners argue, further, that the substance of the transfer of the Colorado property as consideration for the cancellation of the note is that of a sale with the proceeds applied to satisfy the indebtedness. Accordingly, a *456 deduction for the interest paid on the aforesaid indebtedness is allowable under section 163(a). [20]
Respondent contends that petitioner's story does not add up, and questions petitioner's common sense in entering into a partnership under the circumstances herein, implying, without specifically stating it in so many words, that there *457 is something fishy in this sunken ship story. Respondent argues, further, that the transaction herein is a sham lacking any economic substance and should be given no effect for income tax purposes. Respondent's argument is twofold: (1) No transfer of the Colorado property was ever made, as petitioners had control over the property before and after the purported transfer to the Colorado Land Trust; (2) the purported transfer to the Colorado Land Trust was nothing more than a financing or security arrangement, whereby one form of indebtedness was substituted for another. Respondent contends that petitioners did not realize a loss from the partnership because petitioner had no basis in his interest in the partnership, and furthermore, that petitioners have failed to establish that the partnership sustained any loss which would be distributable to petitioners in their taxable year ending December 31, 1978. Respondent also contends that petitioners are not entitled to claim a bad debt deduction as they have failed to prove that petitioner paid any part of the principal of the note that he signed as a guarantor. As a general rule *458 a deficiency determination is presumed to be correct. Welch v. Helvering,290 U.S. 111 (1933). The presumption is procedural and places on petitioners the burden of proof to show that respondent's determination is incorrect. Rockwell v. Commissioner,512 F.2d 882 (9th Cir. 1975), cert. denied 423 U.S. 1015 (1975); Barnes v. Commissioner,408 F.2d 65 (7th Cir. 1969); Rule 142(a). The record herein is devoid of any evidence that the partnership ever engaged in any recovery operations, and that as a consequence of such activities an operating loss resulted; thus, there is no basis for claiming any partnership loss. The record herein does not contain any evidence with regard to the payment of anything by Willard in this affair, other than the alleged transfer of the Colorado property. Therefore, in order to prevail under any theory, petitioners must show: (1) that a valid and enforceable debt was created, of which petitioner was the guarantor, and (2) that Willard satisfied the obligation by a true and complete transfer of the Colorado property. We have before us no evidence that Cayman Exchange ever existed or, *459 if it did, that it ever paid any money to McCann against his note. Thus, petitioners have failed to satisfy their burden of proving the existence of any unconditional and legally enforceable obligation for the payment of money. See Autenreith v. Commissioner,115 F.2d 856 (3d Cir. 1940), affg. 41 B.T.A. 319 (1940). Furthermore, even assuming, arguendo, that such debt was created, the transfer of the Colorado property to the Colorado Land Trust was not a complete payment and satisfaction of it. It is well established that the transfer of assets in satisfaction of indebtedness is equivalent to a sale upon which gain or loss is recognized in the amount of the difference between the basis of the assets transferred and the amount of indebtedness which is canceled. Kaufman v. Commissioner,119 F.2d 901 (9th Cir. 1941), affg. a Memorandum Opinion of this Court; Rogers v. Commissioner,103 F.2d 790 (9th Cir. 1939), affg. 37 B.T.A. 897 (1939), cert. denied 308 U.S. 580 (1939), rehearing denied 308 U.S. 635 (1938); *460 Danenberg v. Commissioner,supra;Unique Art Manufacturing Co. v. Commissioner,8 T.C. 1341 (1947); R. O'Dell & Sons Co. v. Commissioner,8 T.C. 1165 (1947), affd. 169 F.2d 247 (3d Cir. 1948). It is also established that taxation is not so much concerned with the refinements of title as it is with actual command over the property taxed. Corliss v. Bowers,281 U.S. 376 (1930). The transfer of formal legal title is not determinative where the transferor continues to retain significant control over the property transferred. A conveyance of property occurs when the benefits and burdens of ownership have shifted. Dettmers v. Commissioner,430 F.2d 1019 (6th Cir. 1970), affg. 51 T.C. 290 (1968). Pursuant to paragraphs 3 and 5 of the Declaration of Trust, Willard, as trustee, had full power and authority to manage, improve, protect, or sell the trust property, on such terms and upon such conditions as he deemed proper, as if he were the owner of the property; the trust *461 was to be terminated at the earlier of the end of the lives of the beneficiaries or the disposition of the property. Thus, it was within petitioner's power to convey the Colorado property to himself, obviously a "disposition" within the provisions of the trust agreement, thereby ending the trust. Petitioners contend that Willard was not at liberty as trustee to treat the property as his own, because he had a fiduciary duty, the violation of which "would be redressable by the imposition of liability and subjection of any other assets of petitioner to execution upon proper adjudication." Petitioners' argument overlooks the questionability of the underlying transaction giving rise to the creation of the Colorado Land Trust, and the purported transfer of the Colorado property to the aforesaid trust. [21]
Furthermore, the record *462 before us evidences that Cayman Exchange failed to exercise any incidents of ownership in regard to the Colorado property. See Derr v. Commissioner,77 T.C. 708 (1981); Baird v. Commissioner,68 T.C. 115 (1977). Petitioner was responsible for making all and every decision concerning the said property. McKinney continued to look after the property, as he had done since March 1978, when petitioners moved to Florida. McKinney collected the rent payments from the tenants, made the necessary repairs, and remitted the balance to petitioner; [22] property taxes were also paid from the rental payments. [23] McKinney kept petitioner apprised of the problems and happenings with respect to the Colorado property, even after petitioner's alleged resignation as trustee. [24] After the purported transfer to the trust occurred, it was petitioner, not Grecco, who called McKinney to notify him that Cayman Exchange was the new owner. Willard never sold, nor in any way disposed of, the Colorado property. [25]
*463 Consistent with our determination that petitioners have failed to prove that any bona fide debt existed, and that no transfer of property, for the purpose of settling the aforesaid debt, occurred, petitioners are not entitled to an interest deduction as a result of the transactions herein at issue. On these issues, we hold for respondent. Issue 5. The Costa Rican Property.
Based on Willard's dealings with Monty and Christian, petitioners maintain that they are entitled to a theft loss deduction for 1978 in the amount of $50,000 under section 165(c)(3). [26] Petitioners contend that Willard intended to buy beach front property in Costa Rica, but Monty never delivered title to the aforesaid property. In fact, petitioners argue that petitioner paid $50,000 for a packet of worthless documents. On the basis of this, petitioners contend that they suffered a theft loss. Alternatively, petitioners claim a bad debt loss under section 166. Respondent contends that petitioners have failed to establish that they have suffered any loss as a result *464 of their dealings with Monty and Christian, or that the alleged losses were due to theft. Respondent argues, further, that there was no debt created between Willard and Monty or Christian, therefore, section 166 does not afford any relief to petitioners. Pursuant to section 165(a), any loss sustained during the taxable year -- and not compensated for by insurance or otherwise -- shall be allowed as a deduction. Under section 165(c)(3), individuals may deduct losses arising from theft. A theft loss is treated as sustained during the taxable year in which the taxpayer discovers such loss. Section 165(e). Thus, a loss arising from theft is not deductible under section 165(a) for the taxable year in which the theft actually occurs unless that is also the year in which the taxpayer discovers the loss. [27]Section 1.165-8(a)(2), Income Tax Regs.
*465 A loss is not treated as having been sustained unless it is evidenced by a closed and completed transaction. Dawn v. Commissioner,675 F.2d 1077 (9th Cir. 1982), affg. a Memorandum Opinion of this Court; Ramsay Scarlett & Co. v. Commissioner,61 T.C. 795 (1974), affd. 521 F.2d 786 (4th Cir. 1975); section 1.165-1(d)(1), Income Tax Regs.
The determination of whether a loss has been sustained in a particular year is an objective inquiry requiring an examination of the facts and circumstances surrounding the loss. Boehm v. Commissioner,326 U.S. 287 (1945); Ramsay Scarlett & Co. v. Commissioner,supra.
As stated in Edwards v. Bromberg,232 F.2d 107 (5th Cir. 1956), the word "theft" -- as used in section 165 -- is not like "larceny," a technical word of art with a narrowly defined meaning but is, on the contrary, a word of general and broad connotation, intended *466 to cover and covering any criminal appropriation of another's property to the use of the taker, particularly including theft by swindling, false pretenses, and any other form of guile. * * * [fn. ref. omitted; 232 F.2d at 110.] Whether or not a loss from theft has occurred within the purview of section 165(c)(3), depends on the law of the jurisdiction wherein the loss was sustained. Edwards v. Bromberg,supra;Monteleone v. Commissioner,34 T.C. 688 (1960). [28] The exact nature of the crime, whether larceny or embezzlement, or obtaining money under false pretenses, swindling, or other wrongful deprivations of the property of another, is of little importance so long as it amounts to theft. Edwards v. Bromberg,supra;Norton v. Commissioner,40 T.C. 500 (1963), affd. 333 F.2d 1005 (9th Cir. 1964). In a number of cases, theft loss deductions have been sustained by this Court where the theft consisted of false representations made to the taxpayer which induced him to part with *467 his money or property. See Nichols v. Commissioner,43 T.C. 842 (1965); Norton v. Commissioner,supra;Vietzke v. Commissioner,37 T.C. 504 (1961); Monteleone v. Commissioner,supra;Muncie v. Commissioner,18 T.C. 849 (1952). A criminal conviction is not a necessary element in a taxpayer's proof in this Court that a theft loss has been sustained. Monteleone v. Commissioner,supra;Vietzke v. Commissioner,supra;Jones v. Commissioner,24 T.C. 525 (1955). Petitioners have the burden of proving that there was a deductible loss in 1978. Boehm v. Commissioner,supra. See National Home Products Inc. v. Commissioner,71 T.C. 501 (1979). Petitioners have failed to show that they are entitled to a theft loss deduction for 1978 or any other year; they *468 have not proven that any theft was committed under Costa Rican law. Petitioners' allegations and testimony with respect to the instant transaction result in a picture of confusion and contradictions. Willard testified that he thought that he was negotiating to buy beach front property and a lease and got instead a bundle of worthless papers, yet on cross-examination he testified that he "was to be purchasing the Costa Rican company [Piro Inversiones], who [sic] held the title to the property." Petitioner's testimony was equally ambiguous with regard to the participation of Leighton in the transaction. Petitioner testified that "Leighton was going to purchase in a partnership," yet one of the certificates of stock in Piro Inversiones, signed by petitioner, as president, was issued to Leighton. Furthermore, petitioner testified that: "It was set up for him to be an owner and he was to come in as an owner when we received the proper documents." We find that petitioner negotiated for the Costa Rican property and the lease grant to be transferred to Piro Inversiones. The stock of Piro Inversiones would then be transferred to the buyer. The evidence before us reflects that all *469 the above-mentioned transactions were entered into in pursuance of the agreement signed by Monty and petitioner on July 22, 1978. Petitioners strenuously argue that the documents delivered to them were worthless. According to petitioners, Christian gave them some documents, on December 22, 1978, the date on which the final payment on the Costa Rican property was made. Upon discovering that the documents were written in Spanish, Willard allegedly became concerned [29] and located a man who could translate the documents. According to petitioner, he then went to the Costa Rican Consulate in Miami, where he was advised to seek the advice of a Costa Rican attorney. The Costa Rican attorney allegedly told petitioner that the documents were valueless.Petitioner could not recall the name of the man who allegedly translated the documents, nor could he remember the name of the assistant at the Costa Rican Consulate, who allegedly referred him to the Costa Rican attorney, nor the name of said attorney. [30] Petitioner's allegations are nothing but inadmissible hearsay. Furthermore, petitioner's credibility was severely impaired by his continuous contradictions and inconsistencies. Petitioners *470 have failed to demonstrate that the documents before us are anything other than what they purport to be. Moreover, petitioners have not demonstrated that if a theft in fact occurred, it was discovered by them in 1978, or that a reasonable prospect of recovery did not exist. [31]
*471 Petitioners argue, alternatively, that they suffered either a business or nonbusiness bad debt loss and, thus, are entitled to a deduction in the amount of $50,000 pursuant to section 166. Respondent contends that petitioners are not entitled to a bad debt loss deduction because no debt was created when petitioners paid $50,000 to Monty and Christian. Respondent argues, alternatively, that, if indeed any debt arose to the petitioners from Monty or Christian, petitioners have failed to establish that such debt became wholly worthless in 1978. Before a deduction under section 166 is allowed, it is essential that the existence of a valid debt be found. Cullinan v. Commissioner,19 B.T.A. 930 (1930). [32] Only a bona fide debt qualifies for purposes of section 166. A bona fide debt is a debt which arises from a debtor-creditor relationship based upon a valid and enforceable obligation to pay a fixed or determinable sum of money. Section 1.166-1(c), Income Tax Regs.
*472 On the evidence before us, we cannot find that a debt was created when petitioners paid cash in the amount of $1,000 and wrote checks in the amount of $49,000 to Monty and Christian. There was no obligation on the part of Monty or Christian to pay petitioners any money. Even assuming, arguendo, the existence of such debt, petitioners have failed to establish that said debt became worthless in 1978. Petitioners advance yet another contention that they are, alternatively, entitled to a deduction under 165(c)(2) "based on the worthlessness of their investment in 1978." Pursuant to sections 165(a) and 165(c)(2), individuals may deduct losses incurred in any transaction entered into for profit, though not connected with a trade or business. To be allowable as a deduction under section 165(a) a loss must be evidenced by closed and completed transactions fixed by identifiable events. Section 1.165-1(b), Income Tax Regs. A loss shall be allowed as a deduction only for the taxable year in which the loss is sustained. Section 1.165-1(d)(1), Income Tax Regs.
*473 Petitioners bear the burden of proof as to this issue. Rule 142(a). Petitioners have failed to satisfy their burden of proving that they are entitled to a deduction under 165(c)(2). Petitioners have failed to identify an event in 1978 that would enable them to claim the deduction; petitioners did not sell or otherwise dispose of the stock of Piro Inversiones during 1978, nor was the Costa Rican property sold, abandoned, or otherwise disposed of. On this issue, we hold for respondent. Issue 6. Gold futures and foreign currency
Petitioners maintain that they are entitled to a theft loss deduction for 1978 in the amount of $44,044 under section 165(c)(3), [33] based on their investment in deferred delivery contracts in gold and foreign currency with Metals Depository and Alpha Currency. Petitioners contend, alternatively, that they are entitled to a deduction under section 165(c)(2). [34]
Respondent contends that petitioners have failed to establish that their alleged loss was due to theft, or that the supposed theft *474 was discovered in 1978. Respondent argues, further, that petitioners have failed to establish that a claim for reimbursement, with respect to which there was a reasonable prospect of recovery, did not exist. As to petitioners' alternative argument - that they are entitled to a deduction under section 165(c)(2) - respondent concedes that the investment in gold futures and foreign currency was entered into for profit, but contends that petitioners have failed to establish any identifiable event occurring in 1978 which would evidence a closed and completed transaction thus enabling petitioners to claim the aforesaid deduction. Section 165(a) allows as a deduction any loss sustained during the taxable year and not compensated by for insurance or otherwise. In the case of an individual, the deduction under section 165(a) is limited to losses incurred in a trade or business, losses incurred in any transaction entered into for profit, though not connected with a trade or business, and losses of property not connected with a trade or business, if such losses arise from a casualty, or from theft. *475 [35]Section 165(c). To be allowable as a deduction under section 165(a), a loss must be evidenced by closed and completed transactions, fixed by identifiable events and actually sustained during the taxable year. Section 1.165-1(b). A theft loss is treated as sustained during the taxable year in which the taxpayer discovers the loss. Section 165(e). The determination of whether the taxpayer has sustained a loss in a particular year in an objective inquiry; an examination of the facts and circumstances surrounding the loss is required. Boehm v. Commissioner,supra;Ramsey Scarlett & Co. v. Commissioner,supra.The law of the jurisdiction wherein the loss was sustained determines whether a loss from theft has occurred under section 165(c)(3). Edward v. Bromberg,supra;Norton v. Commissioner,supra.The exact nature of the crime is of little importance so long as it amounts to theft. *476 Petitioners bear the burden of proof with respect to this issue. Rule 142(a). Petitioners' claim to a deduction must fail for lack of proof. Petitioners have not established that the acts of Metals Depository and Alpha Currency, and its principals or representatives constituted theft under New York and New Jersey law, respectively. Admittedly, a criminal conviction is not a necessary element in a taxpayer's proof in this Court that a theft loss has been sustained. Monteleone v. Commissioner,supra.However, the loss must be shown to have been occasioned by circumstances clearly indicating theft.Monteleone v. Commissioner,supra;Vietzke v. Commissioner,supra;Jones v. Commissioner,supra.[Emphasis added.] Moreover, petitioners have failed to prove that they discovered any loss in 1978. Petitioners argue that upon receipt of the financial statement from Metals Depository Willard realized that he had been lied to; this, added to the fact that he was also worried because he had not received the confirmation of his December 21 or 22 transfer to Alpha Currency, made him conclude that *477 he had been "ripped off." Upon realizing that he had been swindled, petitioner argues, he decided to contact the authorities. According to petitioner, the calls from the representatives of Metals Depository and Alpha Currency during February 1979, had the purpose of persuading petitioners not to testify against them. Petitioner testified that: "The calls -- those calls that they were calling me about was to try to get me to agree to a settlement so that they -- I wouldn't testify." The evidence before us clearly indicates that petitioner was negotiating with the representatives of Metals Depository and Alpha Currency during the early part of 1979. Section 1.165-1(d)(3), Income Tax Regs., provides that if in the year of discovery there exists a claim for reimbursement with respect to which there is a reasonable prospect of recovery, no portion of the loss with respect to which reimbursement may be received is sustained, for purposes of section 165, until the taxable year in which it can be ascertained with reasonable certainty whether or not such reimbursement will be received. In Ramsey Scarlett & Co. v. Commissioner,supra, *478 we stated: A reasonable prospect of recovery exists when the taxpayer has bona fide claims for recoupment from third parties or otherwise, and when there is a substantial possibility that such claims will be decided in his favor. [Cites omitted; 61 T.C. at 811.] Thus no loss arose in 1978 if petitioner was trying to settle his claim against Metals Depository and Alpha Currency. As to petitioners' alternative contention - that they should be allowed to deduct the $44,040 under section 165(c)(2) - we find that petitioners have failed to favor us with any proof that would require the finding that a loss was sustained in 1978. Petitioners have not established a loss evidenced by a closed transaction as required by section 1.165-1(b), Income Tax Regs.
On this issue, we hold for respondent. To reflect the foregoing, Decision will be entered for the respondent.
Footnotes
1. Respondent's notice of deficiency also contains a disallowance of a portion of petitioners' claimed medical expense deduction in 1978. The claimed medical expense is not at issue, and will be determined as an automatic adjustment under section 213 when all of the issues for tax year 1978 are resolved.↩
2. The document is dated April 19, 1978, but was signed on April 23, 1978.↩
3. Petitioner did not meet Grecco until this time.↩
4. The gain was computed as follows: Gross sales price $370,497 ($350,000 note, plus interest in the amount of $20,496.60 equals $370,497, rounded to the nearest dollar) less adjusted basis of $152,500 equals $217,997.↩
5. One hectare is equivalent to 10,000 square meters (approximately 2.47 acres).↩
6. The record does not contain an English translation of the aforesaid document.↩
7. The Institute of Land and Colonization.↩
8. The aforesaid "Solicitud de Concesion" is written in Spanish, with an attached English translation which purports to be a translation by the General Registry of Concessions of Costa Rica."Solicitud de Concesion" was translated as "Concession Solicitude;" "Application for concession" is a more accurate translation. Where the translations of the documents relating to this transaction - whether the translations by the General Registry of Concessions of Costa Rica or the translations provided by the parties herein -- are incorrect or ambiguous, we have referred to the original documents, as they embody the real intention of the parties. ↩
9. "Seccion de Arrendamientos" was translated as "Land Granting Section;" a more accurate translation is "Lease Division." ↩
10. As previously noted, pursuant to the provisions of Article 17 of the Law of Possessory Informations, No. 4545 of March 20, 1970, the property, title to which has been granted by ITCO, could not be sold, leased, mortgaged, nor in any way encumbered, within three years from the date on which such title was recorded. It appears to us that ITCO has delegated the authority to grant authorization to lease the aforesaid described properties to the Lease Division of the General Registry of Concessions. We note that the application for a lease concession is dated August 23, 1978, 18 months after the resolution of ITCO, and appears to be a fulfillment of Monty's obligation to secure leasing rights for Piro Inversiones.↩
11. The colon is the Costa Rican monetary unit.↩
12. All statutory references are to the Internal Revenue Code of 1954, as in effect in the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, except as otherwise noted.↩
13. The computation is as follows: 200 ounces of gold at $199.20 per ounce equals $39,840, plus $9,600 of selling costs for a total of $49,440.↩
14. Presumably, Steve Hafner. ↩
15. Bob Burns was also associated with Metals Depository. ↩
16. Presumably, Steve Hafner.↩
17. Issues one through four involve the same factual transactions. For convenience, they are discussed together.↩
18. Petitioners argue, alternatively, that the loss was either a theft, or an operational loss. We note that sec. 165 does not apply to payments of principal or interest made by the taxpayer in discharge of part or all of the taxpayer's obligation as a guarantor of a debt. Sec. 1.166-9, Income Tax Regs.↩
19. Petitioners contend that should we determine that Willard signed the note as guarantor, they are entitled to a business or nonbusiness bad debt deduction under sec. 166↩ in the amount of $350,000.
20. Petitioners argue that if the wording of the note is construed as a guaranty, the guaranty only covered petitioner's portion (50 percent) of the note, thus they would be entitled to deduct one-half of the interest claimed, with the balance to be claimed as part of the bad debt. On the other hand, if we determine that petitioner signed as co-obligor of the note, petitioners can deduct the total amount of the interest allegedly paid. There is nothing for us to determine concerning the capacity in which petitioner signed the note. The note clearly states that petitioner signed as guarantor; the partnership agreement was not made part of the aforesaid note. Thus, the statement in the partnership agreement that McCann and Willard were co-making a note has no effect as to the respective liabilities of McCann and petitioner in signing the note.↩
21. If a trust declaration or transfer is obtained by a wrongful act of the trustee, beneficiary, or a third party, the settlor or his successors in interest may have it set aside by a decree in equity. 2 Bogert, Trusts & Trustees, sec. 997, p. 268 (1983 rev.)↩
22. Willard testified that the balance of the rental payments, after deduction of the expenses relating to the upkeeping of the Colorado property, were mailed to an account set up in Grand Cayman for this purpose. Willard could not recall whether he paid the aforesaid amounts by check or money order. Petitioner did not submit copies of any canceled checks or money order slips, nor did he testify as to the name of the bank or account number in which he allegedly deposited the rent payments. ↩
23. The property tax bills were being sent to petitioner, as trustee of the Colorado Land Trust, as late as 1984. ↩
24. Petitioner was speaking to McKinney about the Colorado property on a regular basis after his alleged resignation as trustee of the Colorado Land Trust. ↩
25. We find petitioner's testimony with regard to his failure to sell the Colorado property particularly enlightening. Petitioner testified as follows: Mr. Hampel: You also testified earlier that you called Mr. Grecco in 1982, I believe, and told him you resigned as trustee. Willard: He called me. Mr. Hampel: He called you? Willard: Yes. Mr. Hampel: What did he say? Willard: Well, he was talking about the property and I told him that I didn't want anything to do with it and I wanted to resign. Mr. Hampel: Did he tell you he wanted you to sell that property? Willard: Well, that was what he hoped I would do to start with, I guess.
Mr. Hampel: He hoped you would do that? Willard: But he -- Mr. Hampel: But you didn't, did you? Willard: No. The primary purpose of -- for me being there was to look after the property, because I had been -- or get someone else to. I guess that was his, I think, primary reason for wanting me to even be a trustee. [Emphasis added.]↩
26. We note that such deduction would have to be reduced to take into account the $100 limitation provision in sec. 165(c)(3)↩.
27. The subsequent amendment of sec. 165↩ (by sec. 203 of the Tax Equity and Fiscal Responsibility Act of 1982, Pub. L. 97-248, 96 Stat. 324, 422) does not affect the instant case.
28. See also Fox v. Commissioner,T.C. Memo. 1985-82; Zaccaria v. Commissioner,T.C. Memo. 1961-102↩.
29. We are surprised by petitioner's claim of sudden concern upon discovering that the documents pertaining to the transaction were written in Spanish. Petitioner did not seem to attribute any importance to the fact that the attachment to the letter from Monty dated August 29, 1978 was also written in Spanish. Furthermore, petitioner knew that the official language of Costa Rica is Spanish. Presumably, all official documents are written in that language. ↩
30. Petitioner testified that the office of the alleged Costa Rican attorney was next door to the Costa Rican Consulate, and that he went to visit him immediately after leaving the Consulate. On cross-examination, petitioner testified that he could not remember the date on which he allegedly saw the Costa Rican attorney nor his address. ↩
31. Petitioner admitted that he went back to Costa Rica in 1979, "to see what I could find about doing something about the rip-off."↩
32. See Newman v. Commissioner,T.C. Memo. 1982-61↩.
33. See n. 26. ↩
34. Petitioners claimed a short-term capital loss in the amount of $44,040 on Schedule D of their 1978 Federal income tax return.↩
35. Losses of property not connected with a trade or business, and arising from a casualty or from theft can be deducted only to the extent that the amount of the loss exceeds $100. Sec. 165(c)↩.